[L. A. No. 16971.   In Bank.—March 16, 1939.]

ALBERT J. SIGNER, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Albert J. Signer, *in pro. per.*, for Petitioner.

Philbrick McCoy for Respondent.

THE COURT.—Petitioner was cited to appear before local administrative committee number four, of The State Bar of California, at the city of Los Angeles, on June 13, 1938, to then and there show cause why he should not be disciplined for professional misconduct by reason of certain acts committed by him during his membership of a copartnership with Thomas L. Nair, attorney at law.   Said acts were designated by said citation as involving moral turpitude within the meaning of subdivision 5, section 287, Code of Civil Procedure.   He appeared in obedience to said citation and the local committee recommended his suspension for a period of six months.   The

board of governors on a review of the record recommended to this court that petitioner be suspended from the practice of the law for a period of three years, and the matter has come to this court in due course.

Said acts were set forth in an affidavit verified by petitioner Albert J. Signer, on the behest of Thomas L. Nair, his former law partner, on June 5, 1936, approximately two years prior to the issuance of said citation. Said affidavit upon which the suspension proceedings were instituted was prepared by and acknowledged before Thomas L. Nair as a notary public. The last paragraph of the affidavit contains an averment that affiant, of his own free will, and without coercion or duress, declared that during his association with Thomas L. Nair, under the firm name of Nair and Signer, he appropriated to his use, without the knowledge of said Thomas L. Nair, funds of said office of Nair and Signer, as well as funds of various estates, aggregating $910.65, all of which is specifically set forth in said affidavit, in words and figures, to wit:

"I appropriated to my own use without the knowledge of Thomas L. Nair, funds of said office of Nair and Signer, as well as funds of various estates, as hereinafter set forth." The recital of items follows: "Two hundred twenty-five dollars ($225) withdrawn from the Union Bank & Trust Company of Los Angeles, which sum was in said account as against outstanding checks in the sum of $179.50." (The above item included two small estate accounts.) "I further drew from the clients' account of Thomas L. Nair, during the time I had authority to draw upon same, the sum of $419.10 belonging to the Estate of Marron; the sum of $100 received by me in the case of *Hinton* v. *Walker* from the office of William H. Moore, Jr., trustee; the sum of $154.55, rebate on taxes paid by Nair in the *Estate of Eisenstock,* prior to Nair's departure from the state; the sum of $12 withdrawn from the clients' account being moneys belonging to clients of said office." The above sums aggregate $910.65. For some reason not described the amount was reduced to $900.

The period of time covered by the transactions as listed was approximately eight months. The misappropriations as set forth in the affidavit occurred more than two years before the matter was brought to the attention of The State Bar. The concluding paragraph of said affidavit recites that petitioner freely and voluntarily, in consideration of his release from the partnership agreement with Nair, made June

27, 1935, waived any right, title, claim or interest that he then had, or might acquire in the future or be entitled to by reason of said partnership agreement, or otherwise, in or to any moneys whatsoever that might be received by said Thomas L. Nair on and after the 28th day of May, 1936, by reason of his being an attorney practicing law in the State of California. Affiant also waived any interest in any fees that might be received by said Nair arising out of any matters that might have been instituted during the life of said partnership agreement, or while said Signer was conducting the business under the name of Nair and Signer. It was also agreed by way of averment that the former partnership agreement was null and void ''as if never entered into''. By the last paragraph of the affidavit, affiant agreed to repay to said Thomas L. Nair the sum of $900, instead of $910.65, and he executed his promissory note to Mr. Nair, payable on demand, with interest at the rate of six per cent per annum, payable at maturity.

At the time the affidavit taken by Mr. Nair was laid before the local committee in the form of a complaint, petitioner had paid on account of said promissory note the sum of $524.39, leaving due and unpaid, $375.61. The above sum of $900, which, it is charged, petitioner diverted from its proper channels, was made good by Mr. Nair.

The local administrative committee made exhaustive findings of fact, from which it concluded that the respondent was guilty of acts which involved moral turpitude, within the meaning of subdivision 5, section 287, Code of Civil Procedure. In making its recommendation that petitioner be suspended from the practice of the law for a period of six months, the committee considered the age of petitioner, his previous good record and his subsequent good conduct. In its findings it took occasion to say that it felt that the ''unfortunate contract [this contract does not appear in the record] entered into between respondent and Mr. Nair was responsible in part for the desperate financial situation in which respondent found himself'', in that it had placed a very strong temptation before him to exceed his authority in his undertaking to keep the law office of Nair and Signer a going concern. It also felt that the voluntary withdrawal of Signer from the practice of the law for a period of fifteen months upon the demand of Mr. Nair was a matter which should be taken in consideration in meting out punishment. Its recommenda-

tion was, as heretofore stated, that petitioner be suspended from the practice of the law for a period of six months.

The matter came before the Board of Governors of The State Bar for review on the findings and recommendations of the local committee on August 19, 1938. The findings of fact made by the local administrative committee were approved and adopted as the findings of fact of the board of governors. The board, having adopted said findings as its own, passed a resolution by which it recommended to this court, by a vote of eight yeas as against three noes, that petitioner be suspended from the practice of the law in this state for a period of three years. Five of the eight members voting for said resolution stated that it was their desire that the record show that they "so voted although they believed the degree of discipline insufficient". As to the opposing three, the record shows simply that they voted against the resolution suspending petitioner for a period of three years.

Petitioner appeared before the committee *in propria persona,* and filed an answer in which he admitted each and every matter as set out in the aforesaid affidavit, verified by him on June 5, 1936. Said affidavit, *in haec verba,* furnished the grounds on which the charges of professional misconduct were prosecuted.

In his answer petitioner alleged that all the moneys which he had used were used to sustain himself and maintain the office, including the $900 evidenced by his promissory note, which sum had been paid by Mr. Nair to the persons and for the uses for which it was held; that he had since returned to the practice of the law, and had transacted matters involving considerable sums of money, and that his course of conduct both before and since the matters under investigation arose was without blemish. The local committee found this to be the fact.

He further alleges that he has substantial business contacts and reasonable prospects which insure his wife and himself a comfortable living. He also sets out the bitter humiliation and mental suffering he has endured, and the serious added consequences which would follow a suspension of three years.

The case is quite unusual in its factual structure. Petitioner, now about 32 years of age, started his business career as a messenger in the First National Bank of Los Angeles, and ended his banking career as chief teller. He attended a

southern California law school and was admitted to The State Bar at the age of 25 years. He had several hundred dollars at the time he left the bank and began to practice law. He married one year after he entered the practice at Los Angeles. His wife was a stenographer and worked for a short time after marriage, but her health became impaired by a heart ailment, and she became incapacitated for office work.

Petitioner estimated that his monthly earnings in the practice of the law in 1932 were $125 per month; in 1933, about the same as in 1932; in 1934, about $200 per month; and in 1935, not better than $100 per month. Mr. Thomas L. Nair appears to be an experienced lawyer practicing at the city of Los Angeles. The volume of business which his office transacted was evidently not large. He testified that he knew Mr. Signer a good many years before he passed the bar examination. He was a fraternity friend of his, and was employed by his brother-in-law before entering his office. He suggested to Signer that he come into his office. Nair was then contemplating opening a law office at Shanghai, and also making a tour around the world. He had petitioner come into his office early in June for the purpose of familiarizing himself with his business as he was preparing to and did leave on a long trip on the following October 5th.

The findings upon which the recommendation is made are, in substance, that petitioner entered into a copartnership with Thomas L. Nair, who was contemplating engaging in the practice of the law at Shanghai; that the terms of the partnership were not clearly disclosed in the evidence, but it appears that petitioner was to pay Nair $50 per month and carry on the practice in the office occupied by said Thomas L. Nair as then equipped. Nair departed from Los Angeles in October, 1935, there then being in the bank to the credit of Nair and Signer approximately $200. The bills due October 1st for the operation of the office had been paid by Nair and said sum of $200 was to be applied to the payment of the bills which would fall due November 1st. It was thought by the partners that during the month of October and each month thereafter sufficient moneys would be earned by the copartnership through the efforts of Mr. Signer to pay the overhead of the office, which was slightly more than $200 per month, and likewise to pay Mr. Nair $50 per month and also to provide Mr. Signer sufficient money for living expenses.

No new business had come to the office within ninety days prior to Nair's departure.

The committee found that "Thomas L. Nair must have realized that the earnings which the office had made from June to October did not justify his thinking that sufficient money would be made to pay the items of expense heretofore set forth".

The first misappropriation, in the sum of $100, occurred some week or ten days after Nair departed, which sum petitioner used for living expenses. During Nair's absence abroad, Signer, at Nair's request, sent him not less than $350, and most likely $400. Nair returned in May, 1936, sooner than he had anticipated. During his eight months' absence the earnings of the law business were approximately $800. The overhead of the office was in excess of $200 per month. The committee found the testimony conflicting as to the use made by petitioner of the money misappropriated by him. He testified that he used a part of it to pay office overhead. Nair disputed this testimony, but the committee found that it would appear from the evidence that it would have been impossible to operate the office unless some of the money misappropriated was spent to pay office expenses. The committee found that petitioner had no money of his own and the only means by which the overhead and living expenses could have been met was by the use of the $200 left by Nair, the $800 earnings, and the $900 used as above set forth.

The committee found that upon the return of Mr. Nair petitioner became very much excited and afraid, and he drew $225 and left for St. Louis. At the request of friends he left St. Louis for Los Angeles the second day following his arrival in St. Louis, and upon arriving at Los Angeles signed the Nair affidavit. Nair demanded that he resign as a member of The State Bar. This he declined to do. He consented to and did withdraw from active practice of the law on the demand of Nair. This occurred in May, 1936. He sought and obtained precarious employment as a salesman for a clothing manufacturer, and also was occasionally employed as a bookkeeper.

During the fifteen months that petitioner refrained from the practice of the law upon the demand of Mr. Nair he was unable to earn sufficient wages as a salesman or in any other obtainable employment to furnish himself and wife with the common necessities of life. He lived alternately with his

parents and with his wife's parents. At all times he lived cheaply, and notwithstanding his impoverished condition he paid for a time a dollar a week on account of said promissory note. In August, 1937, he entered the practice of the law without notifying Mr. Nair of his intention to do so. Upon learning that he had entered the practice of the law, Mr. Nair sent for him and demanded that he withdraw from the practice. Mr. Nair said when petitioner entered the practice of the law without consulting him it caused him to feel that he was not being treated right. He felt that petitioner should have come first to him before doing so. Petitioner said to Nair that it was hard to make a living selling dress goods, and he thought he had been punished enough. Mr. Nair thereafter sent petitioner a prepared resignation from The State Bar, with a request to sign the same. Receiving no reply, the proceedings herein were instituted.

Neither the local committee, which was in close personal touch with petitioner and the subject-matter of the proceeding, nor the board of governors, recommended disbarment. Mr. Nair also expressed a personal desire that petitioner be not disbarred. The local committee in an extended review of the matter closed its findings and conclusions with the following recommendation:

"In making the recommendation hereinafter set forth, the committee has considered the age of respondent, his previous good record and his subsequent good conduct. The committee feels that the unfortunate contract between respondent and Mr. Nair was responsible in part for the desperate financial situation in which respondent found himself, which constituted a very strong temptation. The committee further feels that the voluntarily inflicted suspension from the practice of law for fifteen months should be considered, and it has taken these facts into consideration in arriving at its decision. The committee therefore recommends that respondent be suspended as an attorney and member of The State Bar of California for a period of six months."

We are of the opinion that a period of six months, added to the fifteen months which were imposed in the manner set forth in the findings, aggregating twenty-one months, will serve as adequate punishment for the transgressions committed by petitioner in the light of the facts and circumstances shown by the findings herein.

It is therefore ordered that petitioner be and he hereby is suspended from the practice of the law in this state for a period of six months, effective thirty days from the filing of this order.

EDMONDS, J., Dissenting.—I can see no reason why this court should reduce the punishment fixed by the Board of Governors of The State Bar. The only point urged by the petitioner is that suspension for three years is "excessive punishment" for the offense with which he was charged. However, as stated in the opinion, five of eight members of the Board of Governors are on record as believing that suspension for that period of time is insufficient discipline for the conduct admitted by the petitioner. In my opinion the board erred, if at all, on the side of leniency and that its recommendation should be followed.

Rehearing denied. Edmonds, J., voted for a rehearing.